| | |
|---|---|
| In Re:<br><br>TRIKEENAN TILEWORKS INC.<br><br>        Debtor. | Chapter 11<br>Case No. 10-13725 |
| In Re:<br><br>TRIKEENAN HOLDINGS INC. | Chapter 11<br>Case No. 10-13726 |
| | Chapter 11<br>Case No. 10-13727 |
| In Re:<br><br>TRIKEENAN TILEWORKS INC.<br> OF NEWYORK<br><br>        Debtor. | Jointly administered through<br>Case No. 10-13725-JMD |

## DEBTORS' DISCLOSURE STATEMENT
## DATED JANUARY 24, 2011

**NOW COME** the Debtors, Trikeenan Tileworks Inc., Trikeenan Holdings Inc. and

Trikeenan Tileworks Inc. of New York ("the Debtor"), through counsel, pursuant to 11 U.S.C.

§ 1125, and submits the following Disclosure Statement in support of its Plan of Reorganization

dated January 24, 2011 ( hereinafter the "Plan"):

I.       **History and Description of Business and Significant Prepetition Events**

Trikeenan manufactures and sells tiles for use in buildings, chiefly for interior and

exterior design The New Hampshire operation has traditionally focused on artisan and specialty

tiles, generally produced in small quantities for residential use, along with larger mosaic lots for

domestic and international stocking clients. while the New York manufacturing operation manufactures more industrial   glazed brick and ceramic wall, quarry and recycled tile, usually at higher volume. Trikeenan's customers include such high quality national customers as Whole Foods and Starbucks, along with numerous school districts, municipalities, hospitals and banks who buy thin glazed brick to clad interior and exterior walls.    Trikeenan Tileworks Inc. was founded by Kristin and Stephen Powers in 1990 and incorporated in 1999. NH manufacturing operations settled in Swanzey, New Hampshire in 2000.  In 2006, Debtor incorporated Trikeenan Tileworks Inc of New York and purchased state of the art equipment and other assets from Steuben Tile, which had operated a tile factory in Hornell, New York.  Debtor began the New York operation to expand its product line, lower some of its production costs,  and grow its customer base to include larger customers and new channels.  Trikeenan NY entered into equipment loan agreements with multiple New York-based lenders as well as a costly and complex commercial real estate lease agreement with the City of Hornell Industrial Development Authority (IDA).   Trikeenan NH guaranteed all the new obligations.

After an initial ramp up period, New York manufacturing operations began in earnest in 2007. In the first quarter of 2008, Trikeenan raised $765,000 in new investment, allowing for working capital strength and sale, marketing and new investment. Unfortunately, this came  on the eve of a severe downturn in the economy.  The decline in the building industry hampered cash flow and limited the company's growth.  Debt service and rental costs were high in New York; in addition, the equipment runs twenty four hour a day, creating more efficient operations but also resulting in high utility costs when not running at a reasonable capacity.

By early 2010, Debtor was in arrears on both equipment loan and rent expenses in New York. Adverse legal action by the New York landlord forced the Debtor and its affiliates to seek Chapter 11 relief in late August 2010.

.

## II.     POST-PETITION EVENTS

Debtors filed their Chapter 11 petitions on August 30, 2010.

Pursuant to 11 U.S.C. §§ 1107 and 1108, the Debtor has continued to operate in Chapter 11 since the Petition Date. Cash flow continues to be strong.   Debtor continues to use cash collateral pursuant to the terms of a series of orders authorizing cash collateral use in both New Hampshire and New York and requiring adequate protection. These orders have been entered largely with the consent of the relevant lenders, and Debtors remain in full compliance with them.   Despite the difficult economy and the disruptions associated with the Chapter 11 process, Trikeenan has grown its business over 11% through new product innovations in order to address additional sales channels in the hospitality and commercial markets and improved its cash flow over the last several months; in addition to building its regular customers, Trikeenan has attracted the following of new masonry channel representatives and is now working with them on bidding several very large projects, at least some of which are likely to be awarded, including a $750,000 glazed thin brick engagement for a foreign municipality, a $400,000 exterior glazed brick engagement for a hospital in the Northeastern United States, a $300,000 interior glazed ceramic tile engagement for all bathrooms in a hospital in the Northeastern United States,  and a $265,000 glazed brick engagement for a public school in a major metropolitan area.  Trikeenan employs 21 individuals in New Hampshire and 20 in New York; no layoffs have occurred during

the Chapter 11 proceeding.  While the large projects outlined above will assist Trikeenan's emergence from Chapter 11, they are not essential to it. Trikeenan's cash flow projections do not rely on the cash expected from these engagements.

Trikeenan's reorganization strategy is four-fold. To continue to build its presence in the hospitality, commercial and masonry channels through its direct sales strategy and product innovation, to provide the necessary capacity and costs margins needed to be profitable, to consolidate most of the New Hampshire operations into the New York factory and to consolidate Trikeenan's dealer and distribution  support services, sales and operations into a single  location in New Hampshire; to invest   necessary clay mixing and extrusion equipment into the New York factory which had previously been missing, and to add management personnel in New York, likely adding a ceramics plant  manager  rather than fully replacing a ceramics engineer who has resigned. through a reorganized shareholder structure.

Trikeenan recognizes that the operation  of three facilities causes duplicative operating costs. As a result, Trikeenan intends to consolidate the  two New Hampshire facilities into one facility designed for key operations, sales, marketing, artisan tile manufacturing and dealer support services, while the other New Hampshire production operations will move to the Hornell, New  York facility.  Trikeenan estimates that these consolidations will cost about $160,000 but will save more than $195,000 annually through an immediate reduction in rental expense and operating costs and improved efficiencies.  Trikeenan will effect this consolidation as and when cash flow permits and probably not before   early 2012.  Trikeenan will fund the expense in part through the  related expense reductions and in part from ongoing cash flow.  The timing of the consolidation is  not critical to the success of Trikeenan's Plan.

Trikeenan plans to collaborate with Metropolitan Ceramics in Canton, Ohio. ~~Metrolpolitan~~ Metropolitan is currently Trikeenan's primary thin brick and quarry tile supplier. Metropolitan intends to  invest certain ceramic tile manufacturing  equipment formerly used by Meredith Tile, their now-closed artisan tile manufacturing subsidiary, into Trikeenan's Hornell facility.  This equipment includes a full clay mixing and extrusion system, which will improve quality, lower loss rates and allow Trikeenan to broaden its product base.  It will cost about $100,000 to move and install the Meredith Tile equipment, but improved efficiencies and lower clay costs will more than offset the initial investment. Trikeenan also intends to hire an experienced ceramic plant manager in New York and ~~to adjust its management structure~~ to provide more management oversight in the New York facility. A large portion of the new plant manager's salary will be offset by the salary of the departing ceramics engineer.  Trikeenan has always employed operational management expertise in the past on staff or as active consultants, ~~it is seen as necessary~~but Trikeenan has determine it would be preferable ~~now however~~ to base this operational management expertise in the NY facility as opposed to at corporate headquarters in Keene, NH. ~~.~~

Over the last several months, Kristin and Stephen Powers have met with several parties to explore the possible sale of or investment in the Trikeenan companies.  In late October 2010, Trikeenan received a Letter of Intent relative to Trikeenan assets from Elgin Butler Inc, a Texas –based industrial tile manufacturing company which produces inexpensive industrial grade tile at relatively high volume. After careful consideration, the Trikeenan Board of Directors declined to accept the Elgin Butler offer, largely because of concerns that the price offered  was too low and the break up fee and related costs too high, such that the proposal could not be sold to creditors or to the Bankruptcy Court.  Debtor was also in discussions with several other potential buyers

and desired to fully explore its options. There were also numerous problematic conditions to the October Elgin Butler proposal, though in October these conditions were not the primary focus of the debtors' attention. ~~and at~~ ~~that time,~~ At that time, Elgin Butler was unwilling to modify its offer to address the Debtor's concerns.

Elgin Butler had offered twice to buy the assets of Trikeenan in the summer of 2010 ~~also~~ and had reached tentative agreement with the Debtors , but ~~both~~its proposal~~s~~ w~~ere~~as not adequate in amount to satisfy the New York secured creditors. The failure of that transaction was a substantial cause of the Chapter 11 filing.

In December 2010, Elgin Butler resurfaced. The Debtor and Elgin Butler met in mid-December 2010, for several hours to discuss the terms of a possible new offer. During the meeting, it was clear debtors and management remained concerned about the adequacy of the prices to be offered. It also became clear that Elgin Butler and Trikeenan had fundamentally different points of view as to management, production methods and sales strategy. Elgin Butler seemed to desire the brand and distribution channels of the Debtors, for example, but was unwilling to pay any value for those assets or to acknowledge the substantial financial progress the Debtors had made during the Chapter 11 case.~~.~~ ~~Elgin~~ On December 21, 2010, Elgin Butler submitted another Letter of Intent (LOI), substantially similar to the October LOI, in late December 2010. The December LOI contained numerous conditions, including the employment of Mr. and Mrs. Powers on terms which were not acceptable to them, and also including the purchase of equipment from an unrelated third party in Ohio over which Elgin Butler has no control. There were numerous other conditions, which by late December made the proposal unworkable.~~.~~ in light of the upcoming deadlines set forth in cash collateral orders for Trikeenan to file a Plan or Notice of Sale. Elgin Butler initially gave the Debtors a deadline of December

6

24, 2010 to respond to the LOI.  Despite the  Christmas holiday,  the representations of Debtors' counsel that many of the members of Trikeenan's Board of Directors were out of the country, and the request for  a few extra days, Elgin Butler was not willing to extend the response deadline beyond Monday,  December 27, 2010.     Although After some communication between the parties, Elgin Butler eventually removed the employment condition, but no other conditions were altered.  By late December, certain of those conditions, such as the ability to buy the Meredith Tile equipment from an unrelated third party and the receipt of a line of credit, would have given Elgin Butler the ability to walk away at the last minute, potentially crippling Trikeenan's reorganization.  Given their time constraints, the numerous conditions and their growing misgivings about Elgin Butler's approach both to negotiation and  to operations,  The the Trikeenan Board of Directors again declined to sign the LOI and determined the Debtor would proceed with a bootstrap plan unless another buyer materialized promptly.   Additionally, by that time, Trikeenan's  Board felt much more comfortable with the prospect of pursuing a bootstrap reorganization; Debtors had made substantial progress with cash flow and expanded its customer base during the Chapter 11. Kristin and Stephen Powers did not participate in the vote relative to the employment condition .   The suggested terms of their employment did not play a role in the Board's decision to reject the Elgin Butler offer.

Trikeenan Tileworks Inc. rents factory space in Swanzey, New Hampshire and a retail shop and showroom in downtown Keene.  Both spaces are rented on a month to month basis; payments are current and Trikeenan enjoys a very good relationship with both landlords. Trikeenan Tileworks Inc. of New York rents manufacturing space from the City of Hornell IDA; rent payments are passed through to Steuben Trust, holder of the first mortgage on the Hornell real estate.  Payments are not current on the Hornell real estate.

**III. Management**

Kristin and Stephen Powers serve as the primary management for the Debtor's operations. They both lead the debtors' design and marketing efforts and manage the day to day affairs of the business. Trikeenan's Board of Directors provides assistance with strategic decisions and business planning; Ed Guyot, an accountant by profession, has provided substantial assistance with cash flow projections developed in connection with Debtors' plan and the management of the Debtor's books and records. Whitney Ducharme, debtor's regular bookkeeper, performs most regular bookkeeping tasks, including the generation of current asset reports for lenders, short term cash flow forecasts needed to support cash collateral motions, and monthly operating reports. Debtors contemplate the existing management structure and Board of Directors will remain in place, with some adjustments. Management salaries will be restored to booked levels of $60,000 as cash flow permits and may be increased to $90,000 each by 2013, if cash flow permits. During the Chapter 11 case, Kristin and Stephen Powers have taken salaries of $30,000 each, half the current booked levels.

**IV. Financial Information and Liquidation Analysis**

**A. Principal Assets Trikeenan NH**

Debtor's principal assets are as follows:

| | |
|---|---|
| Equipment at liquidation | $30,000 |
| Cash* | $68,700 |
| Accounts Receivable  at 80% | $100,900380,722 |
| Key Man $300,000 life insurance ( term only) | 0 |
| | |
| Total: | $199,603 |

8

\*net of customer deposits and required adequate protection payments

**B.**     **Claims**

From this sum, the following amounts will be deducted:

**1. Secured Claims**

| | |
|---|---|
| TD Bank | $217,306 |
| Statewide Zone Capital | $262,000 |
| Connecticut River Bank | $8742 |
| Total: | $ 488,030 |

**2. Administrative Claims (estimated)**

| | |
|---|---|
| Attorneys' fees, Bernstein Shur Sawyer & Nelson, P.A. | $50,000 |
| U.S. Trustee | $ |
| Exemptions | N/A |

In liquidation, the costs of sale, estimated at 10%, would also be deducted.

**Principal Assets of Trikeenan NY**

Debtor's principal assets are as follows:

| | | |
|---|---|---|
| Equipment | $188,000 | |
| Accounts receivable at 80% | $65,770 | |
| Key man $300,00 life insurance | | Term only and assigned to creditors |
| Total | $253,770 | |

**Secured Claims**

| | |
|---|---|
| NYBDC | $787,000 |
| Statewide Zone | $262,000 |
| REDEC | $215,000 |
| Small Cities | $149,000 |
| Total | $1,413,000 |

Trikeenan Holdings' only asset is the stock in the other two Trikeenan companies, which currently has no  liquidation value. Trikeenan Holdings guaranteed the secured debt of the other Trikeenan companies and faces   unsecured debenture claims totaling approximately $765,000.

.

**Unsecured claims**

Unsecured claims total   $116,173 , exclusive of unsecured deficiency claims and subordinated debenture claims.  In liquidation, unsecured creditors would receive no dividend.

**V.      Pending Litigation**

On the Petition date, several collection lawsuits were pending against the debtors, listed in detail in Debtors' Statements of Financial Affairs. All were stayed by the Chapter 11 filings, and all are resolved by the treatment of claims in the Plan.

**VI. Present and Projected Earnings**

Despite the disruptions of the Chapter 11 process, 2010 revenues were higher than any recent year and much higher than 2009 levels.  Revenues totaled $2.15 million, $1,157,000

attributable to NY production and $992,000 attributable to New Hampshire operations. Shipped sales increased by 11 %. Operations in New York will show a profit of about $30,000; Trikeenan NH operated at a modest $5000 loss. Debtors have attached post-petition cash flow summaries.

The attached cash flow projections show steady growth in revenues, potentially much more substantial growth if multiple large jobs are awarded. Debtors project 2011 revenues of about $2,900,000, increasing to $3,000,000 in 2012 and $3,400,000 in 2013 and steadily increasing profitability. The 2011 revenue projection is based conservatively on a continuation of the 3d and 4th quarter run rates and does not include revenues attributable to significant potential orders. Debtor simply annualized the 4th quarter 2010 revenues to obtain its 2011 projection, thereby assuming only the continued stabilization of the industry, not any large increases in revenue.

**VII    Description of Proposed Plan**:

**ARTICLE I**
**Definitions**

The following terms when used in the Plan shall, unless the context otherwise requires, have the following meanings, respectively:

1.1    "Administrative Expense" – means those expenses described in Section 503(b) of the Code.

1.2    "Administrative Expense Bar Date" – means the date that is thirty (30) days after the Effective Date. The Administrative Expense Bar Date shall apply only to Administrative Expenses that have accrued as of the Effective Date, provided, however, that the Administrative Expense Bar Date shall not be applicable to claims of

11

professional persons retained by the Debtor regardless of when such claims accrued.

1.3  "Allowed Amount" – The Allowed Amount of a Claim or expense for the purposes of this Plan is (a) the amount of the Claim scheduled by the Debtor if the Claim is not scheduled as disputed, contingent, or unliquidated by the Debtor, no objection to that amount is filed by the Claims Objection Date, and the holder of the Claim has not timely filed a properly prepared proof of claim in an amount different than that scheduled by the Debtor; (b) the amount set forth by the holder of a Claim in a timely filed and properly prepared proof of claim if that amount differs from the amount scheduled by the Debtor and no objection to the amount stated in the proof of claim is filed by the Claims Objection Date;  (c) the amount of such Claim established by a Final Order of the Bankruptcy Court if (i) such Claim is scheduled as contingent or disputed and an objection to that amount is filed by the Claims Objection Date or (ii) the amount set forth by the holder of such Claim in a timely filed, properly prepared proof of claim differs from the amount scheduled by the Debtor and an objection to that amount is filed to the proof of claim by the Claims Objection Date or (d) the amount agreed to by the Debtor  and the holder of the Claim.

1.4  "Allowed Claim" – A Claim shall be deemed an Allowed Claim (a) upon expiration of the Claims Objection Date if the Claim, as filed or scheduled, is not disputed by the Debtor or (b) with respect to disputed Claims, at such time as a Final Order is entered allowing the Claim.

1.5  "Allowed Priority Claim" – means an Allowed Claim for which the holder asserts and is determined to be entitled to priority under Section 507 of the Code, in an amount allowed by a Final Order of the Bankruptcy Court.

1.6  "<u>Allowed Secured Claim</u>" – means an Allowed Claim arising on or before the Filing Date that is secured by a valid Lien on Assets of the Debtor which is not void or voidable under any state or federal law including any provision of the Code, but, pursuant to section 506 of the Code, only to the extent of the value of the Assets constituting collateral for such Allowed Claim.

1.7  "<u>Allowed Unsecured Claim</u>" – means an Allowed Claim against Debtor which is not an Allowed Priority Claim or an Allowed Secured Claim.

1.8  "<u>Assets</u>" – means any and all assets, property, property interests and property rights of the Debtor, whether tangible, intangible, vested, contingent, exclusive joint, real, personal or mixed, that constitute property of the Estate.

1.9  "<u>Avoidance Actions</u>" – means causes of action which are pending as of the Confirmation Date and/or which are brought after the Confirmation Date and which arise under sections 544 through and including 550 of the Code.

1.10 "<u>Bankruptcy Court</u>"- means the United States Bankruptcy Court for the District of New Hampshire.

1.11 "<u>Bank</u>" shall mean TD Bank, holder of a first lien on the New Hampshire equipment and a lien on cash collateral

1.12 "<u>Case</u>" – means the case commenced by the filing of a voluntary petition for relief under Chapter 11 of the Code by the Debtor on the Filing Date.

1.13  "<u>Claim"</u> – means claim, as such term is defined in Section 101(5) of the Code, and shall include all rights to payment from the Debtor.

1.14 "<u>Claims Bar Date"</u>- means the date fixed by the Bankruptcy Court as the last day by which a Claim may be filed, other than an Administrative Expense.

1.15 "<u>Claims Objection Date</u>" – means the date that is ninety (90) days after the Effective Date. The failure to object to a Claim by the Claims Objection Date shall not constitute a waiver, acceptance or release of any Claim against a creditor, including Claims based on a creditor receiving preferential or fraudulent transfers avoidable or actionable under Sections 544, 547 or 548 of the Code or under applicable nonbankruptcy law.

1.16 "<u>Class 3 Note</u>" means a Note in the total amount of $359,000 from the Reorganized Debtor to the holders of claims in Class 3

1.17 "<u>Confirmation</u>"- means the entry by the Bankruptcy Court of the Confirmation Order.

1.18 "<u>Confirmation Date</u>" – means the date on which the Confirmation Order becomes final and non-appealable.

1.19 "<u>Confirmation Hearing</u>" – means the hearing held by the Bankruptcy Court to consider confirmation of this Plan, as contemplated by section 1128(a) of the Code.

1.20 "<u>Confirmation Order</u>" – means the order entered by the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Code.

1.21 "<u>Consummation of the Plan</u>"- means the combination of events set forth in sections 4.2 and 5.1 of this Plan.

1.22 "<u>Debtor</u>" – means the three debtors jointly

1.23 "<u>Disclosure Statement</u>" – means that certain disclosure statement filed by the Debtor in respect of this Plan and approved by the Bankruptcy Court as containing adequate information pursuant to a Final Order of the Bankruptcy Court.

1.24 "<u>Effective Date</u>" – means the date that is sixty (60) days after the Confirmation Date provided that no order staying confirmation of the Plan has been entered prior thereto and the

order confirming the Plan remains effective on such date. If an order staying confirmation of the Plan has been entered, the Effective Date means the later of (a) the fifth business day following the date upon which any stay of confirmation of the Plan is no longer effective, or (b) the date that is sixty (60) days after the Confirmation Date.

1.25 "Estate" – means the estate created in the Case pursuant to section 541 of the Code.

1.26 "Filing Date" – means August 30, 2010

1.27 "Final Order" – means an order of a court of competent jurisdiction with respect to which all periods for taking appeal from such order or any order of an appellate court relating to that order have expired with no appeal pending and no stay of such order being then in effect.

1.28 "Hornell Lease" means a lease of non-residential real estate in effect between Trikeenan Tileworks Inc. of New York and the City of Hornell IDA

1.29 "Lien" – means any claim, interest, encumbrance, security interest, restriction, charge or assessment, of every kind, nature and description, against, in or upon property, whether recorded or unrecorded, fixed or contingent, perfected or unperfected, possessory or nonpossessory, known or unknown.

1.30 "Priority Creditor" – means owner and holder of an Allowed Priority Claim.

1.31 "Property" – means all of the Debtor's right, title and interest in and to its Assets.

1.32 "Reorganized Debtor" means Trikeenan Tileworks Inc following the Confirmation of this Plan and after the Effective Date.

1.33 "REDEC" means Regional Economic Development Corporation

1.34 "Secured Creditor" – means the owner and holder of an Allowed Secured Claim

1.35 "Small Cities" means the loan portion of the State office of Community Renewal loan/grant issued to Trikeenan NY in 2009

1.36 " Statewide Zone" means  Statewide Zone Capital,  holder of a claim secured by a junior lien on real estate  and equipment

1.37 "Steuben" means Steuben Trust Company, holder of a first mortgage on the Hornell, NY building and a junior lien on equipment.

1.38 "TD Bank" means TD Bank, N.A, holder of  claims in Classes 1 and 2

1.39 "TD Bank Note 1" shall mean a promissory note in the amount of $ 137,250 to be delivered to TD Bank by the Reorganized Debtor. "TD Bank Note 2" shall mean a promissory note in the amount of $40,000 to be delivered to TD Bank by the Reorganized Debtor.

1.40 "UST" means the Office of the United States Trustee.

Terms not defined herein but defined in the Bankruptcy Code, shall have the meaning set forth in the Bankruptcy Code, unless the context unequivocally otherwise requires.


**ARTICLE II**
**Classification of Claims and Interests**

All Claims, as defined herein and in Section 101(5) of the Code, against the Debtor, of whatever nature, whether or not scheduled or unliquidated, absolute or contingent, including all claims arising from the rejection of leases and executory contracts, all claims arising under 11 U.S.C. §§ 507(a)(1), 507(b) and 503(b) and all interests arising from the ownership of the Debtor, whether resulting in an Allowed Claim or not, shall be bound by the provisions of the Plan and are hereby classified as follows:

Unclassified Claims shall consist of all Allowed Claims against the Debtor for the actual and  necessary  costs  and  expenses  of  administration  entitled  to  priority  in  accordance  with

§§ 507(a)(2) and 503(b) of the Code, including, without limitation, claims for Administrative Expenses and all Allowed Claims against the Debtor entitled to priority in accordance with section 507(a)(8) of the Code, in this case, the payment of approximately $8300 due under the Debtors' Simple IRA plan.

2.1 Class One -- Consists of the claim of TD Bank, secured by cash collateral

2.2 Class Two- consists of the claim of TD Bank secured by equipment located in Keene, New Hampshire and used in the Debtor's new Hampshire operation

2.3 Class Three -- Consists of the Secured Claim of NYBDC secured by a first lien on equipment and cash collateral located in Hornell, New York and used in the Debtor's New York operations.

2.4 Class Four –consists of the claim of Connecticut River bank secured by computer equipment used in the New Hampshire operation

2.5 Class Five -- Consists of the claim of Steuben Trust Company, secured by a first mortgage on commercial real estate in Hornell, New York owned by the Hornell IDA and leased to the Debtor for use in its business premises.

2.6 Class Six –Consists of claim of the City of Hornell, NY IDA for arrearage payments arising from its real estate lease with the Debtor.

2.7 Class Seven– Consists of the unsecured deficiency claims of NYBDC, Steuben Trust, Statewide Zone Capital, REDEC Relending Corporation and Small Cities, secured by junior liens on equipment and cash collateral.

2.8 Class Eight- Consists of general unsecured claims

2.9 Class Nine -consists of the claim of Robert Sarvis, secured by a junior lien on the finished good portion of inventory

2.10    <u>Class Ten</u> consists of the subordinated unsecured debenture claims

2.10    <u>Class Eleven</u> consists of the equity interests of Kristin Powers, Stephen Powers and Dan Henderson

**ARTICLE III**
**<u>Treatment of Claims and Interests By Classes</u>**

All claims, as finally allowed, and all interests are fully and finally satisfied in accordance with provisions of this Plan.

<u>Unclassified Claims</u> are not impaired. Holders of Allowed unclassified claims entitled to priority in accordance with Sections 507(a)(1) and 503(b) of the Code shall be paid in full on the Effective Date or upon the date on which each such claim becomes an Allowed Claim, whichever shall come later, or in accordance with such terms as may be agreed upon by the Debtor and each such holder of an Administrative Expense Claim.

3.1    <u>Class One</u> - The Claims in Class One are impaired TD Bank shall retain its liens and in full satisfaction of TD Bank's claims, Debtor shall pay TD Bank the sum of $137,250 over ten (10) years at 5% interest. Monthly payments will be approximately $1432. On the Effective Date, the Reorganized Debtor shall deliver to TD Bank the TD Bank Note 1 in the original principal amount of $137,250.

3.2    <u>Class Three</u> - The Claim in Class Three is impaired. In full and final satisfaction of the allowed Class 3 claim, the Reorganized Debtor shall execute and deliver the Class 3 Note to NYBDC. The original principal balance of the Plan Note shall be $359,000, representing the estimated current replacement value of the New York equipment, <u>estimated by taking a mid range value between the going concern and liquidation appraisals which the Debtors have reviewed,</u> plus 80 % of the current value of accounts receivable attributable to New York. The

18

Reorganized Debtor shall make monthly payments of principal and interest at the rate of 5%. The Class 3 claim shall be satisfied in full no later than ten years after the Effective Date. Monthly payments will be approximately $ 3808. The Class 3 Note shall be secured by a first lien on equipment located in New York and accounts receivable attributable to New York operations. The Note shall contain commercially reasonable terms as agreed by the parties or failing such agreement, by Order of the Bankruptcy Court. There shall be no prepayment penalty.

3.3 <u>Class Four</u> - The Claim in Class Three is impaired. In full satisfaction of the Class Three claim, the Reorganized Debtor will pay Connecticut River Bank the sum of $1605 on or before December 31. 2011. Debtor anticipates three quarterly installments of $ 438 plus a final payment of $291, beginning on the Effective Date. Any remaining balance due Connecticut River Bank shall be treated as unsecured pursuant to Section 506(a)

3.4 <u>Class Five</u> - The Class ~~Four~~ Five claim is impaired. The holder of the Class Five claim shall retain its lien. In full and final satisfaction of any allowed Class 5 claim, the Reorganized Debtor shall pay to Steuben Trust, through regular lease payments to the Hornell IDA, its regular monthly mortgage payments beginning on the Effective Date. As long as lease payments are current, Steuben Trust shall not disturb the Debtor's peaceful possession of the premises. The Class 5 claim shall be paid in full.

3.5 <u>Class Six</u> - The Class Six claim is impaired. In full and final satisfaction of the Class Five Claim, the Reorganized debtor shall pay to the City of Hornell IDA the sum of $110,783, plus allowed post-petition arrearages, over thirty-six (36) months, in equal monthly installments, without interest. As of the Effective Date, the Hornell lease will be assumed.

3.6 <u>Class Seven</u>  The Class Seven claim is impaired. The Class 6 claims shall be treated as unsecured pursuant to Section 506(a).  In full and final satisfaction of the Class 6 claims, the Reorganized Debtor shall make a pro rata distribution to each holder of allowed Class 7 claim equal to 10% of its claim. Debtor estimates the payments to Class 7 creditors will total $105,845 and will be made in equal monthly installments of approximately $1764 over five (5) years beginning on the Effective Date.

3.7 <u>Class Eight</u>- The Class Eight claims are impaired. in full and final satisfaction of Class 8 claims, the Reorganized Debtor shall make a distribution to each holder of a Class 8 claim equal to 10% of its claim.  Debtor estimates payments to Class 8 creditors will total $11,617 and will be made in equal monthly installments of approximately $484 over two (2) years beginning on the Effective Date.

3.8 <u>Class Nine</u>- The Class 9 claim is impaired. The Class 9 claim shall be rendered unsecured pursuant to Section 506(a) and the Class 8 claimant shall be paid a lump sum dividend of 1%  of his Allowed claim on the Effective Date. The estimated dividend is $285. Debtors reserve the right to object to the allowance of the Class 9 claim.

3.9 <u>Class Ten</u>- The Class Ten claims are impaired.  Holders of Class 10 claims shall receive no cash distribution under the plan but shall be awarded 50% of the   ownership shares and 80% of the   voting shares to be issued by the Trikeenan companies following acceptance of the Plan.

3.10 <u>Class Eleven</u>  The Class Eleven  interests are impaired.  The Class 11 interests shall be reduced to 50% of the   ownership shares and 20% of the   voting shares to be issued by the Trikeenan companies following acceptance of the Plan.

**ARTICLE IV**
**Interests To Be Retained and Rights to be Exercised By The Debtor**

4.1     Under the Plan the Reorganized Debtor retains the right to object to any and all Claims against the Estate, including Claims for Administrative Expenses, and to conduct any litigation in connection with such Claims. The Reorganized Debtor  shall retain ownership of all Property and Assets not expressly returned to claimants or otherwise divested pursuant to the Plan.  On or after the Effective Date, and except as otherwise provided herein, the Property and Assets of the Debtor  tangible and intangible, shall vest in the Reorganized Debtor,  free and clear of all Liens and/or Claims of creditors, except as set forth in this Plan, pursuant to 11 U.S.C. § 1141(b).   In addition, the Reorganized Debtor shall retain control over, and the exclusive ability to prosecute, settle, or abandon, in its sole discretion, any or all Avoidance Actions, all of which causes of action are expressly reserved and preserved hereunder.

4.2     On the Effective Date, the Debtor shall (i) execute and deliver  to the holders of the Allowed Secured Claims in Classes One, Two and Three  properly executed  Notes  (ii) pay the holders of Unclassified  claims as provided herein and (iii) commence payments to the holders of claims in  Classes  Four through Nine.

**ARTICLE V**
**Means Of Execution Of The Plan**

5.1     Provisions Affecting All Creditors.  The Plan shall be funded through the Debtor's cash flow and debt service on allowed claims, as modified herein, in Classes One, Two and Four, through the payments due the Debtor under the Class 3 Note and  and the TD Bank Notes,  plus payments to the holders of claims in Classes Four through Nine.

5.2     Authorized Agent for Closing.  Kristin Powers, President,   shall be the

authorized agent of the Debtor and any documents, instruments or agreements required or contemplated under this Plan to be executed and delivered by the Debtor shall constitute the valid and binding act of the Debtor if duly executed and delivered by the Debtor.

5.3     Cram Down.  In the event that any impaired Class of Claims or Interests fails to accept the terms of this Plan, or is deemed to have rejected this Plan, the Debtor shall and hereby does move the Bankruptcy Court to confirm this Plan pursuant to section 1129(b) of the Code.

**ARTICLE VI**
**Executory Contracts and Unexpired Leases**

6.1     Executory Contracts and Leases.  Except as otherwise provided in the Plan, the Debtor shall, on the Confirmation Date, be authorized to assume all of its unexpired leases and executory contracts, including all pending non-competition and confidentiality agreements, without the payment of any cure or other amounts pursuant to section 365(b)(1) of the Code and, to the extent required by the Code, this Plan shall constitute a motion to assume such executory contracts and unexpired leases.  Notwithstanding the foregoing, if an executory contract or unexpired lease has previously been assumed, assumed and assigned, or rejected by the Debtor pursuant to a Final Order of the Bankruptcy Court, then such order shall continue in full force and effect and nothing in this Plan shall alter the terms of any such order.

**ARTICLE VII**

**<u>Governance and Management</u>**

7.1     <u>Management of Property</u>. On and after the Effective Date and until all obligations under this Plan have been satisfied, Kristin Powers, President, and Stephen Powers shall continue to lead the management team. As cash flow permits, management salaries shall return to booked levels of $60,000 each for Stephen and Kristin Powers. The Trikeenan Board of Directors shall remain in place and shall continue to assist with the management of the Debtors.

**VII.     Alternatives to the Plan**

The alternatives to the Plan include:

A.     Sale by the Debtor: Debtors and management have diligently explored the sale of the Trikeenan companies, without success. The only offer came from Elgin Butler and was not acceptable to the Trikeenan Board of Directors.

B.     A conversion to Chapter 7.

In any sale, there is a substantial risk that unsecured creditors would receive a much lower dividend. In Chapter 7, debtor's assets would be sold at liquidation, requiring the seller to bear the costs of liquidations and requiring the buyer to bear the costs of moving the equipment, which costs would likely outweigh value.

**VIII.     Preferential and Fraudulent Transfers**

None known

**IX.     Affiliated Corporations**

The three debtors are affiliates of each other but there are no other affiliated corporations.

**X.     Tax Consequences of the Plan**

Each creditor, in connection with such accountants or other professionals as it deems

appropriate, is to evaluate the tax consequences of this Plan to its own situation. Based on the Debtor's analysis, the Plan will not result in substantial tax burden to the estate.

## XI.    Objections and Voting

The Bankruptcy Code and Rules allow creditors to object to the Plan and allow creditors to vote whether to accept or reject the Plan. In addition, it is possible to vote in favor of the Plan but object to some provisions thereof, or vote in favor of the Plan and object to the treatment under the Plan.

### A.    Objection to the Plan

If a creditor wishes to object, that creditor must object in writing, specifying in detail the nature of the objection and must file any objections with the Court and with Debtor's counsel on or before _____ at 5:00 p.m. Hearing has been scheduled on confirmation of Debtor's Plan for _____.in the United States Bankruptcy Court for the District of New Hampshire, 1000 Elm Street, 11th Floor, Courtroom One, Manchester, New Hampshire 03101.

### B.    Acceptance of rejection of the Plan

Holders of claims or interests are entitled to vote on the Plan. You will receive a ballot for purposes of voting. Please return your ballot indicating your acceptance or rejection, and please note that all ballots must be received by _____ at 5:00 p.m. You should return this ballot to counsel for the debtor in possession at the following address:

<div align="center">

Jennifer Rood, Esquire
Bernstein Shur
PO Box 1120
Manchester, NH 03105-1120

</div>

Before the Court will confirm the Plan, each class of creditors or interests which is impaired by the Plan must vote to accept the Plan. A class is deemed to have accepted the Plan if more than 50% in number of a particular class vote to accept the Plan and, in addition, if those

members who vote in favor of the Plan, constitute at least 2/3 in dollar amount of the claims or

interests who vote.

<div style="margin-left: 40%;">

TRIKEENAN TILEWORKS, INC.
TRIKEENAN TILEWORKS INC.
 OF NEW YORK

TRIKEENAN HOLDINGS INC.

Debtors and Debtors-In-Possession

</div>

Date:  24 January 2011      By:      <u>/s/  Kristin Powers</u>
Kristin Powers, President

And by their Attorneys:

BERNSTEIN, SHUR, SAWYER & NELSON, P.A.

By:      <u>/s/ Jennifer Rood</u>
Jennifer Rood, Esq., BNH 01395
670 N. Commercial Street, Suite 108
P.O. Box 1120
Manchester, NH 03105-1120
(603) 623-8700
jrood@bernsteinshur.com