UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

In re:                                                                                     Chapter 11

Trikeenan Tileworks, Inc.,                                                      Bk. No. 10-13725-JMD
Trikeenan Holdings, Inc., and                                                Bk. No. 10-13726-JMD
Trikeenan Tileworks, Inc. of New York                                Bk. No. 10-13727-JMD
        Debtors
                                                                            Jointly Administered

*Jennifer Rood, Esq.*
*Bernstein, Shur, Sawyer and Nelson, P.A.*
*Manchester, New Hampshire*
*Attorney for Trikeenan Tileworks, Inc.,*
*Trikeenan Holdings, Inc., and*
*Trikeenan Tileworks, Inc of New York,*
*Debtors*

*Benjamin E. Marcus, Esq.*
*Drummond Woodsum*
*Portland, Maine*
*Attorney for Elgin Butler, Inc.,*
*Creditor and Plan Proponent*

## MEMORANDUM OPINION

### I. INTRODUCTION

The Court has before it two competing chapter 11 plans of reorganization.  On September 3, 2010, the Court entered an order directing joint administration of the cases of Trikeenan Tileworks, Inc. ("Trikeenan NH"), Trikeenan Holdings, Inc. ("Holdings"), and Trikeenan Tileworks, Inc. of New York ("Trikeenan NY") (collectively the "Debtors") (Doc. No. 19).  On March 17, 2011, the Debtors filed an amended disclosure statement (Doc. No. 224) (the

"Debtors' Disclosure Statement") that was later approved by the Court (Doc. No. 232).
Afterwards, the Debtors filed a supplemental amendment to the Debtors' Disclosure Statement on April 14, 2011 (Doc. No. 258) (the "Supplemental Amendment"). That same day, the Debtors filed an amended chapter 11 plan (Doc. No. 257) (the "Debtors' Plan"). Elgin Butler Inc. ("Butler"), Steuben Trust Company ("Steuben"), New York Business Development Corporation ("NYBDC"), and Statewide Zone Capital Corporation of New York ("Statewide") filed objections to the Debtors' Plan (Doc. Nos. 291, 294, and 295).

A competing disclosure statement and chapter 11 plan was filed by Butler, a creditor. Butler filed an amended disclosure statement on March 17, 2011 (Doc. No. 227) ("Butler's Disclosure Statement") which was also approved by the Court (Doc. No. 233). Butler then filed an amended chapter 11 plan on April 22, 2011 (Doc. No. 284) ("Butler's Plan"). Butler's Plan only reorganizes Trikeenan NH and Trikeenan NY (the "Butler Debtors"). The Debtors objected to Butler's Plan (Doc. No. 296).

A confirmation hearing was scheduled for May 3, 2011, on both the Debtors' Plan and Butler's Plan. After consideration of the objections and arguments at the confirmation hearing, the Court determined it needed to resolve certain issues before proceeding with confirmation of either plan. Those issues are: (1) whether the Debtors' Plan violates the fair and equitable requirement of 11 U.S.C. § 1129(b)(2)(B)(ii); (2) whether the Debtors' Plan violates 11 U.S.C. § 1129(a)(1) because it misclassifies claims pursuant to 11 U.S.C. § 1122(a); and (3) whether Butler's Plan was filed in good faith as required by 11 U.S.C. § 1129(a)(3). The Court ordered Butler and the Debtors to each file a memorandum of law and scheduled oral arguments (Doc. No. 310). Butler and the Debtors timely filed their memoranda of law (Doc. Nos. 350 and 351)

(respectively "Butler's Memo" and "Debtors' Memo"). After oral arguments on June 9, 2011, the Court took the matters under advisement.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

**II. FACTS**

On August 30, 2010, the Debtors filed for bankruptcy under chapter 11 of the Bankruptcy Code. The Debtors consist of three companies: Trikeenan NH which operates in New Hampshire, Trikeenan NY which operates in New York, and Holdings which is the sole shareholder of the two operating companies. Kristen and Stephen Powers (the "Powers") serve as the Debtors' primary managers and own most of the stock in Holdings.[1] The assets and liabilities of the three companies are intertwined. Trikeenan NH has traditionally focused on artisan and specialty tiles which are generally produced in small quantities. Trikeenan NH's primary secured creditor is TD Bank who holds two claims secured by either cash collateral or equipment. Trikeenan NY manufactures industrial glazed brick and ceramic wall, quarry and

---

[1] The Debtors' documents have been inconsistent regarding their corporate structure. Each Debtor filed a separate statement of financial affairs that listed the Powers and other individuals as shareholders. Yet, the Debtors have repeatedly stated that Holdings is the sole shareholder of the operating companies. In fact, Holdings' schedule B lists stock in Trikeenan NH and Trikeenan NY. Neither Trikeenan NH's nor Trikeenan NY's statement of financial affairs lists Holdings as a shareholder. Based on the Debtors' uncontested representations during oral arguments, the Court shall treat Holdings as the sole shareholder of the two operating companies and the individual shareholders, i.e. the Powers, as shareholders of Holdings.

recycled tile, usually at a high volume. It leases manufacturing space under a lease agreement with the City of Hornell IDA ("Hornell"). Hornell delivered to Steuben a non-recourse promissory note secured by a first mortgage on the manufacturing space and guaranteed by the Debtors and the Powers.[2] Trikeenan NY delivered a note to NYBDC. The note is secured by personal property and guaranteed by Trikeenan NH, Holdings, and the Powers.[3] Trikeenan NY also delivered a note to Statewide that is secured by a mortgage on the manufacturing space and the personal property of Trikeenan NY and Trikeenan NH. The note to Statewide is guaranteed by Holdings and the Powers. Finally, Holdings' sole asset is the stock in the two operating companies. Holdings' debt consists of guaranties on the debt of the two operating companies and $765,000 owed to subordinated unsecured claim holders (the "Debenture Holders").

After filing for chapter 11, the Debtors continued to operate their businesses and have jointly filed the Debtors' Plan. The Debtors' Plan groups creditors into eleven classes. The relevant classes for purposes of this opinion are classes seven, ten and eleven. Class seven consists of unsecured deficiency claims held by the secured creditors of all three debtors.[4] The Debtors' Plan proposes to pay each holder of a claim in class seven 10% of its claim in equal monthly installments over five years. Class ten only contains the Debenture Holders, and class eleven includes the equity interests of the Powers and Dan Henderson. Under the Debtors' Plan,

---

[2] Under this arrangement, Hornell is the title owner of the manufacturing space but is not liable for the payments under the note. Those payments are satisfied by the lease payments made by Trikeenan NY. In the event Trikeenan NY defaults under the lease, Steuben's remedy is to foreclose on the mortgage and pursue Trikeenan NY for any additional collateral it pledged and the Debtors, and the Powers, for any deficiency claims.

[3] The Debtors' plan also stated that REDEC Relending Corporation and Small Cities hold junior liens on equipment and cash collateral.

[4] TD Bank was added to class seven in the amended certificate of vote (Doc. No. 311).

4

the class ten Debenture Holders do not receive a cash distribution, but are awarded 50% of the ownership shares and 80% of the voting shares issued by the reorganized Debtors. Class eleven's equity interests are reduced to 50% of the ownership shares and 20% of the voting shares. According to the amended certificate of vote, class seven rejected the Debtors' Plan. Because class seven rejected the Debtors' Plan, Butler filed an objection arguing the Debtors' Plan is not fair and equitable because classes ten and eleven receive value before a dissenting senior class is paid in full.

Along with the Debtors' Plan, the Debtors concurrently filed the Supplemental Amendment. The Supplemental Amendment added a loan contribution by debenture holder James Putnam to the Debtors' Plan (the "Putnam Loan"). Attached to the Supplemental Amendment is a commitment letter outlining the terms of the Putnam Loan.[5] According to the commitment letter, upon confirmation of the Debtors' Plan, James Putnam would make a loan of $177,000 to the reorganized Holdings where the note would either mature in five years or James Putnam could convert the obligation on the Putnam Loan into preferred shares of the reorganized Holdings. Once the proceeds of the Putnam loan are received, the reorganized Holdings would make an equity contribution to Trikeenan NH. Trikeenan NH would then use the proceeds to

---

[5] There is an inconsistency between the terms in the commitment letter and the arguments in the Debtors' Memo regarding corporate structure. The commitment letter states the loan is to the reorganized Trikeenan NH, while the Debtors' Memo states it will be made to the reorganized Holdings, who will then make an equity contribution to the operating companies. The Debtors' Plan is unclear in its entirety regarding the ownership of the three reorganized Debtors. Is Holdings still the sole shareholder of the reorganized operating companies or are the Debenture Holders and the Powers sharing ownership of all three entities? As noted in footnote 3 of Butler's Memo, this distinction is not critical since the same issues arise regardless of the structure. The Court shall consider the representations in the Debtors' Memo as the correct statement of the parties to the Putnam Loan, and the commitment letter as the correct statement of the terms of the Putnam Loan.

pay the claims of TD Bank and the Putnam Loan would be secured by the same assets as the TD Bank loan.

In addition to the Supplemental Amendment, the Debtors' Memo added details to the Debtors' Plan as well. The Debtors' Memo states that the Powers and the board of directors have waived priority wage claims and administrative claims to help the Debtors confirm a plan of reorganization. In the Debtors' Memo, the Powers have allegedly waived $22,550 in priority claims and approximately $48,000 in administrative claims. The Debtors' board of directors have waived priority claims worth $7,500 and administrative claims totaling $22,500. The Debtors' schedule E does not match the figures in the Debtors' Memo. Schedule E states that the board of directors and the Powers each have only $11,725 in priority claims. Furthermore, the waiver of administrative claims was not addressed in the Debtors' Disclosure Statement or the Debtors' Plan. Prior to filing the Debtors' Memo, the only references to waived wage claims were made by the three outside directors of the Debtors in responses to Butler's objection to confirmation of the Debtors' Plan. <u>See</u> Doc. Nos. 246, 280, and 282. Those references were not made under oath, are only argument and have no evidentiary value.

While the Debtors have been in bankruptcy, Butler purchased an unsecured claim in order to gain standing to file a competing plan. Butler is a Texas company that manufactures and distributes thin-tile, structural tile, and brick. It had conducted negotiations to purchase the Debtors both before and after the filing of the bankruptcy petitions. None of the negotiations have resulted in a sale of the Debtors to Butler.[6] The breakdown in negotiations led Butler to

---

[6] The reason for the lack of a sale has been heavily debated and appears to be a contentious topic between the parties.

purchase a small claim from W.B. Mason[7] and to propose a competing plan of reorganization. In Butler's Plan, Butler proposes an investment of $800,000 in the reorganized Butler Debtors, $300,000 of which is a cash infusion. Butler's Plan includes three elements to restructure the Butler Debtors. Butler intends to (1) consolidate the New Hampshire and New York operations in New York, (2) update the equipment at the New York manufacturing plant, and (3) implement new sales persons, e-marketing, and an experienced plant manager. Butler's Plan was accepted by five out of seven classes. Class three did not vote and class seven, which is the equity class, was deemed to have rejected the plan because it received no distributions. If confirmed, Butlers' Plan would make Butler the sole owner of the reorganized Butler Debtors and would replace the existing officers and directors of the Butler Debtors with Butler's management team. In effect, Butler's Plan is a hostile takeover of the Butler Debtors. As a result, the Debtors objected to Butler's Plan arguing it was not filed in good faith.

## III. DISCUSSION

Before proceeding with a contested confirmation hearing on the competing plans, the Court shall consider whether the Debtors' Plan complies with the fair and equitable and classification requirements of the Bankruptcy Code. 11 U.S.C. §§ 1122 and 1129(b)(2)(B). Similarly, the Court shall determine whether Butler's Plan was filed in good faith. 11 U.S.C. § 1129(a)(3).

### A. The Absolute Priority Rule

---

[7] On January 13, 2011, W.B. Mason transferred its claim of $1,204.34 to Butler. That claim was amended to $485.56 after the transfer.

The Debtors' Plan must be fair and equitable in order to be confirmed. A debtor can confirm a chapter 11 plan by satisfying all of the requirements of 11 U.S.C. § 1129(a). Among those requirements is acceptance of the plan by all impaired classes of creditors. 11 U.S.C. § 1129(a)(8). When an impaired class rejects the plan, the debtor may still "cramdown" the plan over that class's dissenting vote under 11 U.S.C. § 1129(b). There are two conditions to confirm a plan pursuant to § 1129(b). First, the debtor must satisfy all of the requirements of § 1129(a), except for § 1129(a)(8). Second, the plan must not discriminate unfairly and must be "fair and equitable" to the class that rejected the plan. 11 U.S.C. § 1129(b); see Bank of America v. 203 N. LaSalle St. P'ship., 526 U.S. 434, 441 (1999). For a plan to be fair and equitable to a dissenting class of impaired unsecured creditors, the class must either be paid in full or "the holder of any claim or interest that is junior to the claims of such class [cannot] receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B). This section is often referred to as the "absolute priority rule." The absolute priority rule prevents a junior claim holder from receiving value before a non-accepting senior claim is paid in full, i.e. subordinated debt and old equity cannot receive stock in the reorganized debtor if unsecured creditors are not paid in full.

In certain circumstances, courts have allowed old equity to receive stock in the reorganized debtor in exchange for contributions of added capital. In re Bonner Mall P'ship, 2 F.3d 899, 906 (9th Cir. 1993). That set of conditions is commonly referred to as the "new value corollary" to the absolute priority rule. Id. The new value corollary is based on the premise that where junior interest holders provide a fresh contribution of capital into the debtor, they are not receiving value "on account of" their prior interest but as a result of the new value contribution.

8

Case v. Los Angeles Lumber Co., Ltd., 308 U.S. 106, 121 (1939) (decided under the Bankruptcy Act). The Supreme Court has not decided whether the new value corollary continues to exist after enactment of the Bankruptcy Code. In re CGE Shattuck, 1999 BNH 046 (Bankr. D.N.H. 1999). However, prior decisions in this district have held that the new value corollary still applies under the Bankruptcy Code. Id. In addition, the Seventh Circuit and the Ninth Circuit have both recognized the corollary. LaSalle, 526 U.S. at 443.

Assuming the new value corollary exists, a junior claim holder's contribution must have specific characteristics to qualify as new value. Bonner, 2 F.3d at 908. The junior claim holder must offer value that is: (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization and (5) reasonably equivalent to the value or interest received. Id. An offer of value must satisfy all five requirements to qualify as new value that would shield old equity from the absolute priority rule. Id. at 908-09.

Here, the Debtors' Plan violates the absolute priority rule because junior claim holders receive equity interests on account of their prior interest before senior claim holders are paid in full. The Debtors' Plan can only be confirmed through a cramdown because class seven rejected the plan. Therefore, assuming the other requirements of § 1129(a) are met,[8] confirmation of the Debtors' Plan is contingent on it being fair and equitable to class seven creditors. On its face, the Debtors' Plan is not fair and equitable. Class seven is made up of general unsecured claims which are senior to the subordinated unsecured claim holders in class ten and the equity interests in class eleven. Yet, classes ten and eleven retain stock in the reorganized Debtors, while class seven only receives a 10% cash dividend. The Debtors argue that these junior interest holders

---

[8] As stated earlier, Butler contends that the Debtors' Plan violates 11 U.S.C. § 1129(a)(1).

are not receiving the stock "on account of" their prior interest, but due to new value contributions. The Debtors claim that there are two types of new value contributions.

### 1. Putnam Loan

First, the Debtors argue that the Putnam Loan is new value. During oral arguments, the Debtors stated that James Putnam is making the loan to the reorganized Holdings. The funds from the Putnam Loan would be transferred to the operating companies as an equity contribution that will be used to pay the TD Bank loan. As a result, the reorganized Holdings receives stock in the reorganized operating companies in return for the equity contribution.

At first blush, this argument seems to address the absolute priority issue. However, it only resolves the issue as to the operating companies. Holdings has many of the same creditors as the operating companies since they offered guaranties on most of the loans. Therefore, retention of equity in the reorganized Holdings by the Powers and the Debenture Holders before the claims of Holding's creditors are paid in full is also a violation of the absolute priority rule. The Debtors argue the Putnam Loan in itself is a new value contribution to Holdings.

The Putnam Loan does not satisfy two elements of a new value contribution. The Putnam Loan is not new value because there is no new net addition of value or capital. The Putnam Loan is balance sheet neutral since it replaces TD Bank's secured loan as a new liability of Holdings pledged by the assets of Trikeenan NH. Like the lender in <u>In re Tucson Self-Storage, Inc.</u>, James Putnam is not bearing the cost, risk, or burden of an equity contribution. 166 B.R. 892, 900 (B.A.P. 9th Cir. 1994). The Debtors argue that there is no intention to pay the Putnam Loan and that he will convert the debt into preferred shares. But the Debtors miss the point articulated in <u>Tucson</u>. James Putnam has the option of keeping his status as a secured

creditor, but if the fortunes of the company improve, he can convert his debt to equity. On the other hand, in the event of default, he can repossess his collateral to satisfy his claim. Hence, under the terms of the Putnam Loan, James Putnam does not face the risks normally associated with an equity investment. He simply steps into the shoes of an existing secured creditor and, in addition, obtains a right to convert to equity for no additional contribution. This conversion right is not held by the existing secured creditor.

Moreover, the Debtors do not explain how a new value contribution by one debenture holder allows for the other Debenture Holders and the Powers to retain equity in the proportions provided in the Debtors' Plan. Or in other words, the Debtors' Plan does not take into account that, under the new value corollary, the interest received must be equal to the value given. For example, James Putnam is arguably infusing $177,000 of new value into the reorganized Holdings, yet the Powers will hold 50% of the ownership shares and James Putnam will apparently share the other 50% pro rata with the other Debenture Holders. This economically illogical scheme is further evidence that the Putnam Loan is not an equity contribution but a new liability to James Putnam that replaces the TD Bank loan with no value contributed for the new conversion option. For those reasons, the Court finds that the Putnam Loan is not new value.

### 2. Waiver of Claims

The Debtors also argue that waivers of administrative claims and priority claims by the Powers and the board of directors are equivalent to a new value contribution. There is precedent for finding waivers of administrative claims to be new value contributions. In <u>In Red Mountain Machinery</u>, the Court found that without a waiver of the administrative expense claims, the debtor's plan could not be confirmed. 448 B.R. 1, 16 (Bankr. D. Ariz. 2011). In <u>Red Mountain</u>,

11

the debtor's disclosure statement showed that administrative claims totaled $880,000, the debtor's cash position was $522,000, and the equity holder was willing to waive $480,000 in administrative expense claims. Since the debtor did not have enough cash to confirm the plan without the waiver of the administrative claims, the court held that the waiver was a new value contribution necessary for a successful reorganization.

The Court finds that the waivers of administrative and priority claims in this case are not new value because they are not necessary for a successful reorganization. Prior to filing the Debtors' Memo, there had been no mention on the record of any postpetition fees to managers and directors that would qualify as administrative claims. More importantly, the Debtors did not list waivers of claims in the Debtors' Disclosure Statement or the Debtors' Plan. Put simply, the Debtors claim that the waivers of administrative and priority claims are vital to the success of the Debtors' Plan but failed to say one word about them in either the Debtors' Plan or the Debtors' Disclosure Statement. The Court cannot conclude that waivers of claims are necessary to successfully complete a plan of reorganization when neither the plan nor the disclosure statement address the issue. Accepting an ad hoc new value argument thrown together on the eve of confirmation would make the absolute priority rule a superfluous, low hurdle to confirmation instead of a safeguard of the Bankruptcy Code's priority scheme. See Case, 308 U.S. at 115-16 (noting creditors should be given precedence over stockholders in reorganization plans); Northern Pac. R. R. Co. v. Boyd, 228 U.S. 482 (1913) (holding the rights and interests of stockholders cannot be preserved at the expense of creditors); Louisville Trust Co. v. Louisville, N.A. & C. Ry. Co., 174 U.S. 674, 683 (1899) ([W]e observe that no such proceedings can be rightfully carried to consummation which recognize and preserve any interest in the stockholders

without also recognizing and preserving the interests of not merely of the mortgagee, but of every creditor of the corporation."). Accordingly, there has been no new value contribution by class ten or class eleven.[9] Without a new value contribution by classes ten and eleven, the Debtors' Plan does not comply with the fair and equitable requirement of § 1129(b)(2)(B)(ii). Therefore, confirmation of the Debtors' Plan shall be denied and the issue of improper classification is moot.

### B. Good Faith

A plan of reorganization can only be confirmed if it is proposed in good faith. 11 U.S.C. § 1129(a)(3). The term "good faith" is not defined but "is generally interpreted to mean that there exists a "reasonable likelihood that the plan will achieve a result consistent with the purposes and objectives of the Bankruptcy Code." In re River Valley Fitness One Ltd. P'ship, 2003 BNH 031, 6 (Bankr. D.N.H. 2003) (citing In re Madison Hotel Assocs., 749 F.2d 410, 424 (7th Cir. 1983)). "The purpose of a Chapter 11 reorganization proceeding is to enable a business to rehabilitate itself and become a profitable going concern." In re Maxim Indus., Inc., 22 B.R. 611, 613 (Bankr. D. Mass. 1982); see Madison, 749 F.2d at 426 (noting chapter 11 was intended to allow a financially troubled company the ability to restructure its debt and become a viable company that can pay its creditors). "The Courts determination that a plan was 'proposed in good faith' is a finding of fact that should be made in light of the totality of the circumstances surrounding the formulation of the plan." River Valley, 2003 BNH 31, 6. In this case, the Court's finding of good faith in this matter is limited to the factual record before it.

---

[9] On this record, the Court need not decide whether the alleged waivers of administrative and wage claims satisfy the other requirements for new value. See Bonner, 2 F.3d at 908-09.

The Court's record is confined to Butler's Plan, any agreed upon facts, and the Court's docket. Based on that record, the Court could conclude that Butler's plan was not proposed in good faith only if (1) purchasing a small unsecured claim in order to gain standing to propose a competing plan is considered bad faith as a matter of law or (2) the content of Butler's Plan is not consistent with the objectives of the Bankruptcy Code.

Butler's purchase of W.B. Mason's unsecured claim for the purpose of proposing a competing plan does not constitute bad faith as a matter of law. Bankruptcy courts have consistently held that an unrelated party can purchase claims for the sole reason of insuring standing to propose a competing plan of reorganization. Matter of Embrace Sys. Corp., 178 B.R. 112, 121 (Bankr. W.D. Mich. 1995); In re Rook Broad. of Idaho, Inc., 154 B.R. 970, 973 (Bankr. D. Idaho 1993); In re First Humanics Corp., 124 B.R. 87, 92 (Bankr. W.D. Mo. 1991). However, a claim can be purchased in bad faith if the purchase was made with the intent to "block impede or in any way manipulate confirmation of [a] debtor's plan." Humanics, 124 B.R. at 92; see In re DBSD North America, Inc., 634 F.3d 79 (2d Cir. 2011) (stating the court may designate an entity under § 1126(e) where a creditor purchased a claim to obtain some benefit to which it was not entitled). Ultimately, the question of good faith is based on whether the claim purchaser's actions were in conformity with the restructuring purposes of chapter 11.

In the present case, Butler's purchase of a claim and proposal of its plan coincides with the goals of chapter 11. Butler's Plan restructures the Butler Debtors' secured debt, provides a dividend to unsecured creditors, infuses capital into the Butler Debtors, and provides a three step process to restructure the operations of the Butler Debtors. Butler's Plan has received significant creditor support. From the four corners of Butler's Plan, the Court can only glean that Butler

14

intends to maintain the Butler Debtors as viable entities that will create a going concern value for creditors. In fact, during oral arguments, the Debtors stated that Butler's Plan has many similarities to the Debtors' Plan.

Nonetheless, the Debtors argue that Butler's Plan was not proposed in good faith because Butler is simply trying to destroy a competitor. Butler's status as a competitor is a disputed issue of fact. Even assuming that Butler is a direct competitor, the Debtors have failed to explain how Butler's Plan is in contravention of the policy goals of the Bankruptcy Code. Being a competitor who proposes a competing plan to take over the debtor does not equal bad faith per se. To the contrary, the Supreme Court has noted that lifting exclusivity to propose a competing plan opens the door for other parties to bid for the equity of the company. LaSalle, 526 U.S. at 457-58. There is no requirement that a competing plan must be friendly to the existing management or ownership of a debtor. Nor is there any bar in the Bankruptcy Code against a competitor proposing a take over of the debtor.

The Debtors cite several cases to support their argument. In In re Unichem, the court held that the competing chapter 11 plan was filed in bad faith. 72 B.R. 95 (Bankr. N.D. Ill. 1987). Prior to the bankruptcy filing in Unichem, the plan proponent was held to have breached his fiduciary duty to the debtor because he intentionally hid developments that were harmful to the debtor in order to help a competitor owned by his son. Id. at 99. After the debtor in Unichem filed for bankruptcy, the plan proponent offered a plan that liquidated the company. Id. As a result, the court determined that because the plan proponent helped drive the debtor into bankruptcy and then proposed a plan to liquidate the debtor, the competing plan was clearly

15

meant to destroy a competitor.  Id. at 100.  The Unichem court held that the destruction of a competitor is not consistent with the goals of chapter 11.  Id.

The Debtors also argue that a plan proponent is subject to the same standard as a voting creditor in that they cannot propose a plan with an "ulterior motive."  See In re Figter Ltd., 118 F.3d 635, 639 (9th Cir. 1997).  In Figter, the court stated that "pure malic, 'strikes,' and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a competing business, all plainly constituting bad faith, are motive which may be accurately described as bad faith."  Id.

Though the standards of bad faith articulated in these cases may be accurate, they do not apply to the facts in the present case.  The record is void of any evidence that Butler's Plan is intended to destroy the Debtors.  Unlike in Unichem, Butler's Plan attempts to reorganize the Butler Debtors and run the company under different management and ownership, a concept that is certainly consistent with the goals of chapter 11.  Accordingly, the Court finds that Butler's Plan was proposed in good faith.  Any doubts regarding the feasability of Butler's Plan or any additional factual allegations of bad faith can be raised in further proceedings with the presentation of supporting evidence.

## IV.  CONCLUSION

For the reasons discussed above, the Debtors' Plan violates the absolute priority rule, is not fair and equitable to a dissenting unsecured creditor class as required by § 1129(b)(2)(B) of the Bankruptcy Code and may not be confirmed.  For the reasons set forth above, the Court finds

that the purchase of a small claim for the purpose of filing the Butler Plan as a competing plan of reorganization was done in good faith as required by § 1129(a)(3) of the Bankruptcy Code.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue a separate orders consistent with this opinion.

ENTERED at Manchester, New Hampshire.


Date: July 14, 2011                         /s/ J. Michael Deasy
                                            J. Michael Deasy
                                            Bankruptcy Judge